[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Debra J. Abrams, and the defendant, Eliahu Katz, were married on February 4, 1988 at Ocala, Florida. The parties have resided in Connecticut for more than one year before the date of the complaint, January 4, 1991 and continued in residency through the date of the hearing. There are no children born of this marriage.
The parties, Debra J. Abrams and Eliahu Katz, and not their attorneys, have executed a written stipulation that their marriage has broken down irretrievably. Both parties have appeared in this suit and each has testified in court that the marriage has broken down irretrievably.
The court finds that it has jurisdiction of this marriage and of the parties. The court finds that the marriage has broken down irretrievably and that a decree of dissolution of the marriage should enter.
This is the second marriage for each of the parties. The plaintiff wife is 39 years of age and states she is presently in good health. She appears to the court to be fit both physically and mentally. She does complain that because of the stress and tension which developed during the marriage, she suffered from headaches and developed an asthmatic allergy. She states she gained 34 pounds during the marriage, but lost that weight after she caused the writ in this action to be served on the defendant. She attributes this loss to the tension which arose during the pendency of this action. The defendant asserts, however, that the loss was attributable to a regimen of exercise and diet followed by the plaintiff after she joined a health club in December, 1990.
The defendant husband is 42 years of age and states that he is in good health. It appears that he was in sporadic therapy with a psychologist at the time of the marriage and during the marriage period. The defendant appears to the court to be fit both physically and mentally.
The couple had joint sessions with a marriage counselor to little avail.
The plaintiff is a high school graduate and has been employed as a beautician and hairdresser. The defendant is a high school graduate and has received a degree from a technical institute in electronics. During their courtship, the plaintiff was employed as a hairdresser in Old Lyme, Connecticut. The CT Page 1072 defendant was employed on a contract basis with A.T.T. Bell Labs in New Jersey at a salary rate of $80,000 per year.
The defendant purchased a condominium in Stamford, Connecticut, as a mid-point between Old Lyme and New Jersey. When the couple married, he rented out a condominium he owned in New Jersey, gave up his New Jersey contract and developed his business as a data communications consultant for computer systems and equipment sales called Commlinkes. The condominium, Unit C, 2400 Bedford Street, Stamford, Connecticut, became the marital residence.
For a period of time after the marriage, the plaintiff commuted to Old Lyme from Stamford to pursue her employment as a beautician. In May of 1989, either at the insistence of the defendant who was concerned about the distance she had to travel and the risk of her driving at excess speeds or by mutual agreement, the plaintiff gave up her employment in Old Lyme. In the summer of 1989, she took a skin care refresher course at a beauty institute in New York City and was offered employment at that school after she completed the course. Because the defendant did not think the compensation was adequate, she gave up that position. In January, 1990, she began employment with her present beauty salon in Westport. Her financial affidavit indicates a gross income from salary, commission, and tips to be approximately $24,000.00. She is well qualified to practice her trade and capable of earning a good income from that trade.
The defendant is the sole owner of Commlinkes. His principal customer has been Crosslands Savings Bank. He also has as clients the Housing Authority of the City of Stamford, American Savings Bank, and several small businesses. In 1988, the business grossed approximately $561,000 and netted $411,788; in 1989, it grossed $491,000 and netted $332,000; in 1990, it grossed $252,000 and netted $158,776. The defendant attributes the reduction in income to the difficulties encountered by his prime customer, Crosslands Bank.
The defendant claimed that, during the final quarter of 1991, the business grossed $41,000 and netted only $10,533 of which net he drew out $10,000. The situation may not be as bleak as depicted, since bank records seem to indicate that during that same period he deposited $19,000 to his personal accounts. Although the testimony indicated that during the marriage, the defendant usually drew $64,000 to $66,000 from the company as salary, bank records seem to indicate that during the first nine months of 1991, the defendant deposited over $75,000 to his personal accounts.
The defendant has demonstrated an ability to earn a CT Page 1073 substantial income in his field, despite present business uncertainties.
During the earlier years of the marriage, it was the practice of the defendant to deposit $4,000 to $5,000 per month into the plaintiff's account, while she deposited her salary to that account. From that fund, the mortgage and other condominium charges, the household expenses and the credit card expenses would be paid. The credit cards were in the plaintiff's name, since at that time the defendant had no cards. The couple would dinner out several times per week, employed a cleaning woman on a bi-weekly basis, and took a number of vacations.
The Stamford condominium was purchased for $220,000. The defendant provided all of the down payment. Title was taken in joint names and both parties signed the mortgage note and mortgage deed. The defendant purchased the plaintiff's engagement ring for approximately $8,000 and her wedding rings for approximately $2,400. The honeymoon cost him approximately $15,000. He also purchased a living room set for the condominium, paying about $8,000, and he purchased a bedroom set for approximately $3,000.
The marriage is of brief duration. The couple were married in February, 1988. Although initially a romantic and loving union by July or August of 1990, both parties agree, the marriage had developed substantial problems. The plaintiff complains that the defendant had become nasty, aggressive and verbally abusive — given to temper tantrums. The defendant complains that the plaintiff had no sense of the economic constraints being imposed by the banking crisis and business downturn and its effect on his company. She insisted on wanting to live and spend in the rather free-wheeling manner they had earlier enjoyed. She would not cooperate in curtailing expenses.
In February, 1991, after having been served with the complaint, the defendant stopped depositing the $4,000 to $5,000 to the plaintiff's account and the mortgage was allowed to go into default. The mortgage is now in the process of being foreclosed. In the summer of 1991, the couple engaged in a "War of the Roses" routine, wherein the defendant disconnected all of the phones in the condominium except the one in his bedroom and both stubbornly allowed the electricity bill to go into default, resulting in the cut-off of electrical power. At the height of summer, they endured no lighting and no air-conditioning.
In July, 1991, this court ordered the defendant to vacate CT Page 1074 the condominium pendente lite, and to pay alimony pendente lite of $2,400 per month beginning in August, 1991, from which the plaintiff was to pay the carrying costs of the condominium to forestall foreclosure. It appears that the bank has refused to accept mortgage payments and the portion of the $2,400 payment which represented the mortgage payment of $1,725.45 has been held by counsel in trust. At the time of the hearing, this amounted to $8,352.70.
The court has reviewed the current financial affidavits of the parties, has considered the factors set forth in General Statutes Sections 46b-81 and 46b-82 and has considered the claims for relief filed by the parties. The court especially notes the financial contributions of the defendant, the need for the plaintiff to establish a residence for herself as a result of the court's assignment of the real property to the defendant, her need to complete the development of a client following in her work, and that some of her credit card liabilities may have been incurred as a result of the arrangement of the parties during the marriage, and finally wishes to restore her as closely as possible to her situation before the marriage.
The court therefore makes the following orders concerning assignment and division of property and issues of alimony:
a. All right, title and interest in and to the condominium known as Unit C, 2400 Bedford Street, Stamford. Connecticut shall vest in the defendant, Eliahu Katz, and to that end, the plaintiff, Debra J. Abrams, shall quitclaim to the defendant all of her right, title and interest in and to the premises;
b. Notwithstanding that assignment, the plaintiff, Debra J. Abrams, may remain in exclusive possession of the premises to facilitate her residential relocation until March 15, 1992, and thereafter, or upon earlier vacation by the plaintiff, sole and exclusive possession shall be in the defendant;
c. The defendant shall be responsible to pay the mortgage, arrears of mortgage payments, and all expenses incidental to the condominium, including taxes, insurance, condominium charges, utilities and repairs. The defendant shall indemnify and hold the plaintiff harmless against any of these obligations or liabilities, including any obligation on the note and mortgage.
d. The defendant shall pay the plaintiff $674.55 (being that portion of the temporary order that exceeded the monthly mortgage payment) for the arrears of alimony pendente lite due for December, 1991 and for any similar portion of the monthly CT Page 1075 payment in escrow since that time through February, 1992.
e. The balance of the money held in escrow shall be paid over to the defendant to be applied against the mortgage.
f. The defendant shall pay to the plaintiff as a division of property the sum of $23,000.00. This payment shall be made on or before the 30th of April, 1992. At his election, the defendant may, upon notice to the plaintiff not later than March 31, 1992, chose to pay this amount in 24 equal monthly installments on an amortized basis with interest at the rate of eight (8%) percent per annum, beginning on the first day of April, 1992 and monthly thereafter until March 1, 1994, when the entire unpaid balance shall be due. The court estimates these payments will be $1040.23, but counsel for the plaintiff may submit an amortization schedule prepared by a recognized financial organization for approval by the court.
g. In light of the payment ordered, neither party shall be obliged to pay alimony or support to the other now or in the future.
h. Each party shall be responsible for the liabilities shown on his or her financial affidavit submitted in conjunction with the hearing and each party shall retain the assets shown on his or her respective affidavits.
i. Since both parties make indefinite claims to personal property in the nature of household furnishings in their affidavits, the parties shall divide such property by agreement, except that the living room set and bedroom set shall be assigned to the defendant. In the event of a disputed claim, that dispute shall be submitted to the family relations office for mediation, taking into consideration the findings made in this memorandum. If the matter cannot be resolved by such mediation, the dispute shall be submitted to this court for resolution.
j. The defendant has already made a contribution of $2,000.00 towards the plaintiff's attorney's fees. The division of property directed above contemplates that each party shall be responsible for his or her own balance of attorney's fees.
A decree of dissolution of marriage may enter with judgment in accordance with this memorandum.
NIGRO, J.